495 F.2d 863
 74-1 USTC P 16,138
 The GREYHOUND CORPORATION, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
GREYHOUND LINES, INC., Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
GREYHOUND LINES, INC., Defendant-Appellee.
The GREYHOUND CORPORATION and Greyhound Lines, Inc.,
Plaintiffs-Cross-Appellants,
v.
UNITED STATES of America, Defendant-Cross-Appellee.
 Nos. 71-2977 to 71-2979 and 71-2989.
 United States Court of Appeals, Ninth Circuit.
 April 11, 1974.
 
 Gary R. Allen, (argued), Scott P. Crampton, Asst. U.S. Atty. Gen., Meyer Rothwacks, of U.S. Dept. of Justice-Tax Division, Washington, D.C., J. L. Browning, U.S. Atty., Martin A. Schainbaum, Asst. U.S. Atty., San Francisco, Cal., for appellant-cross appellee United States.
 John B. Lowry, (argued), Gordon M. Weber, Robert A. Blum, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for appellee-cross appellant Greyhound Corporation.
 Before CHAMBERS, KOELSCH and KILKENNY, Circuit Judges.
 OPINION
 KILKENNY, Circuit Judge:
 
 
 1
 The cases included within this consolidated appeal involve the appropriateness of refunds under 26 U.S.C. 6421(b), of federal fuel excise taxes paid during a period encompassing April 1 to May 31, 1957, and for each quarter during the calendar years 1958 through 1963. One consolidated income tax return was filed each year on behalf of all of Greyhound's operating divisions and subsidiaries. Greyhound Lines, Inc. and The Greyhound Corporation are treated as one entity.
 
 
 2
 Sitting without a jury, the district judge tried the consolidated actions and entered findings of fact and conclusions of law on which judgments were entered granting a refund of the taxes as claimed, but without interest. A conforming judgment was entered in an action instituted by the United States. From these judgments, the United States filed timely notices of appeal. Greyhound filed timely cross-appeals on the issue of interest.
 
 
 3
 During the periods under scrutiny, Greyhound was principally engaged in furnishing, through its operating divisions, scheduled common carrier public passenger land transportation service along regular long distance routes. It also operated local transit systems and provided charter bus service. That Greyhound's local service differed substantially and was treated separately from its intercity and long distance service is undisputed. The overall relevance of the dissimilarity is, however, under challenge. The appellant concedes that Greyhound's local service was more conducive to use by short distance passengers who traveled regularly between home and work, school or shopping and similar activities. Likewise, it concedes that Greyhound's bus service on its local routes was more frequent than on its mainline routes, and was primarily concentrated in the morning and later afternoon hours, Monday through Friday, and was characterized by frequent stops and the utilization of zone fares and commutation tickets.
 
 ISSUE
 
 4
 At issue is whether Greyhound, under the factual pattern here presented, should include in the denominator of the 60% Test required in 26 U.S.C. 6421(b),[1] the revenue from its local transit bus service, rather than the combined revenue of its local transit and mainline bus service.
 
 
 5
 The district court found that Greyhound's local bus service was an operation separate and distinct from its mainline service. In making this determination, it followed what is well established precedent in resolving what constitutes separate local bus service. Since we are under a duty to pay due respect to the findings of the district court on factual issues, and are enjoined from overturning such findings unless clearly erroneous, we deem it appropriate to set forth in the footnote what we deem to be the controlling findings on the principal issues of fact.[2]
 
 
 6
 For the purpose of computing the refund, if any, due under 6421(b), the parties stipulated that the last quarter of 1963 would be the governing period. During that period, Greyhound's passenger fare revenues reflect the following:
 
 
 7
 Passenger Eastern Div. Western Div. Other Total
 ------------ ------------ ----------- -----------
fare revenue
from local
service $ 433,618 $ 1,935,582 -0- $ 2,369,200
Passenger
fare revenue
from mainline
service $19,857,318 $16,236,619 $24,048,306 $60,142,243
 ------------ ------------ ----------- -----------
Total passenger
fare
revenue $20,290,936 $18,172,201 $24,048,306 $62,511,443
 
 
 8
 Incorporated in the foregoing figures is a total of $1,553,523, in 'commuter fare revenue'. Section 6421(b)(2) provides a limitation upon the granting of tax refunds for overpayments of diesel fuel excise taxes to those transit systems whose 'commuter fare revenue' constitutes at least 60% Of the total passenger revenue set forth in 6421(b)(1). The definition of 'commuter fare revenue' is set forth in 6421(d)(2), and includes: (A) amounts paid for transportation which do not exceed 60 cents, (B) amounts paid for commutation or season tickets for a single trip of less than 30 miles or, (C) amounts paid for commutation tickets for one month or less.
 
 
 9
 By using the revenue from local service operations alone, the percentage of commuter fare revenue constitutes 65.6% Of the total and, consequently, sufficient to permit a refund under the 60% Test of 6421(b)(2). If appellant's contention is correct, namely, that Greyhound's total revenue should include both the local service income and the mainline service income, then the percentage of commuter revenue to the total revenue would constitute only 2.5%, and, therefore, wholly insufficient to permit a tax refund under 6421.
 
 
 10
 Even though the tax exemption statute construed in Public Service Coordinated Transport v. United States, 367 F.2d 417, 177 Ct.Cl. 337 (Ct.Cl.1966), relates to a different section of the Code, we agree with the district court that the decision is of significant importance in providing a solution to the complex issue before us, and accordingly, use the principles enunciated therein, as guidelines to apply to the facts before us.
 
 
 11
 In Public Service, the issue centered on whether 307 buses out of a total fleet of 2,400 buses were exempt from the Federal Highway Use Tax. The Use Tax there imposed was subject to an express exemption for those buses designated as transit-type buses under the provisions of 4483(c), providing among other things:
 
 
 12
 '4483. Exemptions
 
 
 13
 (c) Certain transit-type buses.-- Under regulations prescribed by the Secretary or his delegate, no tax shall be imposed by section 4481 on the use of any bus which is of the transit type (rather than of the intercity type) by a person who, for the last 3 months of the preceding year (or for such other period as the Secretary or his delegate may by regulations prescribe for purposes of this subsection), met the 60-percent passenger fare revenue test set forth in section 6421(b)(2) as applied to the period prescribed for purposes of this subsection.'
 
 
 14
 Clearly, the tax exemption mentioned in 4483(c) is based upon the language of 6421(b)(2), the statute before us for interpretation. In Public Service, the problem centered on the characteristics of transit-type buses; here, the problem centers on the characteristics of 'local transit systems.'
 
 
 15
 26 U.S.C. 4483(c), 26 U.S.C. 6416(b)(2)(H) and the tax exempt provisions of 26 U.S.C. 6421, constitute an integral part of the Congressional plan under the Highway Revenue Act of 1956. Consequently, the tax exemption for transit-type buses involved in Public Service, and the fuel tax refund now before us, being each fundamentally based on the 60% Test outlined in 6421, should be considered together. Therefore, the criteria established in Public Service, while not absolutely controlling, is of great importance in arriving at our ultimate conclusion on whether the findings of the district court are clearly erroneous. The nine criteria established in Public Service are outlined in the footnote.[3]
 
 
 16
 Greyhound's own guidelines in distinguishing between its intercity runs and 'local' operations, established long before the decision in Public Service, include not only the nine previously mentioned, but several others, all of which were in evidence before the trial court.
 
 
 17
 The findings of the lower court that Greyhound operates two separate types of service, mainline and local, and the finding that there was 'no persuasive evidence' that Greyhound was a 'single, unified and integrated transportation system,' are not clearly erroneous.
 
 CONSTRUCTION OF 26 U.S.C. 6421(b)
 
 18
 When 6421[4] was enacted on June 29, 1956, the exemption pertained to '. . . tax-exempt passenger fare revenue'. The legislation defined tax-exempt passenger fare revenue as revenue attributable to fares which were exempt from the tax imposed by then 4621 by reason of then 4262(b) of the Revenue Code. Section 4262(b) exempted from taxation amounts paid for transportation which did not exceed thirty-five cents, amounts paid for commutation or season tickets for single trips of less than 30 miles and amounts paid for commutation tickets for one month or less.
 
 
 19
 By the amendment of June 28, 1962, 76 Stat. 118, the phrase '. . . commuter fare revenue' was substituted for 'tax-exempt passenger fare revenue' in 6421(b)(2) and 6421(d), the latter setting forth the definition of 'commuter fare revenue'.
 
 
 20
 In our analysis of the legislation, we must look to the Highway Act of 1956, 70 Stat. 387. Section 4041 of the Act, 70 Stat. 387, requires the imposition of the fuel tax. Recognizing the financial problems of those operating local transit-type systems in and around metropolitan areas Congress enacted, as part of the same legislation, 6421, 70 Stat. 394, with the title 'Gasoline Used for Certain Nonhighway Purposes or by Local Transit Systems.' Subsection (a) was headed 'NONHIGHWAY USES' and provided for a refund of the tax to nonhighway users. Subsection (b), with which we are here concerned, was headed 'LOCAL TRANSIT SYSTEMS' and provided for a tax refund for overpayments of the fuel tax imposed by 4041, the issue now before us on appeal.
 
 
 21
 Appellant argues that we should entirely overlook the title to the section and the subsection and hold that the language of (b)(1) covers intercity, interstate and transcontinental service, as well as local transit service, and that the 60% Test mentioned in subsection (b)(2) should apply to all revenue of the carrier, rather than local transit type revenue. The argument is untenable. Even appellant must concede that if the language 'LOCAL TRANSIT SYSTEM' was removed from the heading and inserted in what appellant claims is the controlling sentence, the result would be obvious. The forepartof the sentence would then read: '. . . If gasoline is used by local transit systems during any calendar quarter in vehicles while engaged in furnishing scheduled common carrier public passenger land transportation service along regular routes, . . ..'
 
 
 22
 While the title to an Act may not be employed to limit the plain language of the text, it can be a very useful tool in resolving an ambiguity. Maguire v. Commissioner, 313 U.S. 1, 9, 61 S.Ct. 789, 85 L.Ed. 1149 (1941); Knowlton v. Moore, 178 U.S. 41, 65, 20 S.Ct. 747, 44 L.Ed. 969 (1900).
 
 
 23
 The legislative history of the statute reinforces our conclusion that the Congress never intended subsection (b) to apply to any type of transportation other than local transit systems.
 
 
 24
 We quote from H.R.Rep. No. 2022, 84th Cong., 2d Sess., 1956-2 Cum.Bul. 1289.
 
 
 25
 'Special relief is also provided, in the case of gasoline, diesel fuel, and special motor-fuel taxes, for fuel used in the operation of local or mass transportation systems. 'The exemption for local mass transportation is provided because many such transportation system already are operating near or below the break-even point and it is feared that the imposition of the additional motor-fuel taxes in this case would have a serious adverse effect upon provision for such transportation, which is essential to the large suburban population of the country.'
 
 
 26
 This type of relief is again mentioned in H.R.Rep. No. 2022, 84th Cong., 2d Sess., 1956-2 Cum.Bul. 1288, where, in substance, it is said that the purpose of the legislation is to provide relief for local or mass transit systems in the case of the taxes on motor fuel and the tax on the use of heavy vehicles.
 
 
 27
 Of particular significance is the language of the history which demonstrates that the 60% Test was intended to be applied only to the revenue obtained by the local transit systems. See H.R.Rep.No. 2022, 84th Cong., 2d Sess., 1956-2 Cum.Bul. 1305, from which we quote:
 
 
 28
 'Clause (i) of subparagraph (H) (of 6416(b)(2)) provides that the subparagraph will apply, in respect of any gasoline, diesel fuel, or special motor fuel used during any calendar quarter . . ., only if at least 60 percent of the total passenger fare revenue derived by the transit system during the prescribed period from furnishing (scheduled passenger service) was attributable to (commuter fares).'
 
 
 29
 The same test was applied to the parallel vehicle tax:
 
 
 30
 'An exemption is provided from the use tax for mass or local transit buses. Under the Bill buses need not pay this tax, even though weighing more than 26,000 lbs. when loaded if--
 
 
 31
 '(2) At least 60 percent of the passenger fare revenue of the bus system involved was attributable to (commuter fares).' (See H.R.Rep.No. 2022, 84th Cong., 2d Sess., 1956-2 Cum.Bul. 1290.)
 
 
 32
 The language of the Senate Committee Report is essentially the same as that found in the House Report. S.Rep. No. 2054, 84th Cong., 2d Sess., 1956-2 Cum.Bul. 1310-12 and 1314.
 
 
 33
 In determining the purpose and coverage of a taxing statute of doubtful meaning, a court should turn to the legislative history to determine the Congressional intent. Colony, Inc. v. Commissioner, 357 U.S. 28, 78 S.Ct. 1033, 2 L.Ed.2d 1119 (1958). Resort may be had to explanatory legislative history, no matter how clear the statutory words may appear on superficial examination. Harrison v. Northern Trust Co., 317 U.S. 476, 63 S.Ct. 361, 87 L.Ed. 407 (1943); Northwestern Mutual Fire Ass'n v. Commissioner, 181 F.2d 133, 135 (C.A.9, 1950).
 
 
 34
 For that matter, the appellant's position is not even supported by the Treasury Department's Regulations or the instructions of the Internal Revenue Service to taxpayers. Regulation 26 C.F.R. 48.6421(c)-1(a)(1) provides for a refund claim on fuel used by 'local transit systems'. Substantially the same language is used in 26 C.F.R. 48.6421(c)-1(a)(2). The regulations direct that refund claims for fuel used 'by local transit systems', must be made on a special form. 26 C.F.R. 48.6421(c)-1(b)(1). Following through on the pattern for refund, 26 C.F.R. 48.6421(c)-1(b)(2)(ii) provides that such claims for refund by a 'local transit system' must set forth specified information, while 26 C.F.R. 48.6421(c)-1(b)(2)(iii) provides that a statement must be submitted by a 'transit system' to support a claim for payment.
 
 
 35
 The construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. Lewis v. Martin, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); United States v. Radio Television News Directors Ass'n., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Zemel v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965).
 
 
 36
 Here, it is proper to invoke the well known rule of construction that in cases of doubt, a taxing statute must be construed most strongly in favor of the taxpayer and against the government. Tax statutes are not to be extended by implication beyond the clear import of the language used and, in case of doubt, are construed most strongly against the government. Hecht v. Malley,265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949 (1924); Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917).
 
 
 37
 We must assume that the Congress understood the meaning of the words 'local transit systems' and used the words in their ordinary meaning. United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938).
 
 
 38
 In construing a revenue act, we presume that the legislative authority uses words in their ordinary sense and with the meanings commonly attributable to them. Commissioner v. Plestcheeff, 100 F.2d 62 (C.A.9 1938). Where the statute does not define the words used, they must be accepted in their ordinary everyday meaning. Herring Magic v. United States, 258 F.2d 197 (C.A.9 1958). Even a judge, with his alleged tendency to find something where nothing exists, would face an insurmountable quandary in finding something mystical or obscure in the phrase 'local transit system'.
 
 
 39
 It is wholly illogical to assume that the Congress intended to make it economically unattractive for intercity operators to enter the local transit fields or force those intercity operators already so engaged to abandon or discard their local transit system's operation. The Congressional history would indicate that precisely the opposite was true. This history makes it crystal clear that the Congress was attempting to help all local transit systems for the very fundamental reason that most were in dire financial straits. Surely, the Congress did not intend that the intercity or intercontinental companies operating local transit systems would either waive the benefit of subdivision (b) or go through the mockery of incorporating 'strawmen' corporations in order to operate the transit-type systems.
 
 
 40
 Appellant's argument that only a wholly independent entity, which operates a local bus transportation system separate from an intercity system, can claim the refund under 6421(b)(2), is meritless. Even the Treasury Department Regulations recognize that where, as here, one tax return is filed for each of the years in question and there is included in each return the revenues from both its mainline and its local systems, the one return is sufficient to permit the refund. 26 C.F.R. 48.6421(b)-1 clearly recognizes the right of an operator engaged in both intercity and local transit transportation systems to file the one return and claim the refund under 6421(b)(2). The example of XYZ Corporation, under 26 C.F.R. 48.6421(b)-1(d) is a good demonstration of this interpretation.
 
 APPELLANT'S AUTHORITIES
 
 41
 The appellant's principal case is Interstate Transit Lines v. Commissioner, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943). Despite a rather forceful argument, we do not believe that Interstate Transit stands for the proposition, on the record before us, that a transportation company and its subsidiary cannot be treated as a separate 'person(s)', within the meaning of the statute. At the outset, we place no particular significance on the use of 'person' in the context of (b)(2). The word is used throughout the Act and obviously employed by the Congress to designate the owner or operator of the transportation system. But that as it may, the Supreme Court, in Interstate Transit, did not decide whether the parent corporation and its subsidiary were a single 'person'. 319 U.S. 594-595, 63 S.Ct. 1279. Indeed, the true holding of the Court was that the parent and the subsidiary conducted separate and distinct businesses and that one could not deduct the reimbursed deficit of the other. To this extent, Interstate supports appellee, rather than appellant.
 
 
 42
 Neither is Rev.Rul. 67-92, 1967-1 Cum.Bul. 361 of any help to appellant. The relevant portion of that ruling suggests that the revenue from a bus company's airport bus service must be included with revenues from the company's other local service in computing the 60% Test under 6421(b). The essential substance of the ruling is that all of the revenue from the bus company's local, but public, service must be included in the return of the local transit system. The ruling has no application whatsoever to intercity, transcontinental or other mainline service.
 
 
 43
 It is interesting to note that 'person' is used throughout the Internal Revenue Code to mean and include 'an individual, a trust, estate, partnership, association, company or corporation.' 26 U.S.C. 7701(a)(1). Greyhound was a corporation which was operating a local transit-type system under the district court's findings and, consequently, a proper claimant under 6421(b)(2).
 
 
 44
 Other rulings, regulations and authorities cited by appellant are no more in point than those just mentioned.
 
 INTEREST
 
 45
 Greyhound cross-appeals on the issue of interest on the refund. It relies on 26 U.S.C. 6611(a), which provides:
 
 
 46
 '6611. Interest on Overpayments
 
 
 47
 (a) Rate.-- Interest shall be allowed and paid upon any overpayment in respect of any internal revenue tax at the rate of 6 percent per annum.'
 
 
 48
 The statute was enacted long prior to the passage of 26 U.S.C. 6421(b)(1). Subsection 'b) of the latter enactment requires the Secretary to pay '(without interest)' the refund here in question.
 
 
 49
 Where, as here, we have a special statute governing a specific refund which provides for the disallowance of interest on refunded sums, the special statute normally controls even though there is a general section of the Internal Revenue Code which provides for interest on tax overpayments. Bulova Watch Co. v. United States, 365 U.S. 753, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961); General Motors Corp. v. United States, 292 F.2d 502, 155 Ct.Cl. 267 (1961).
 
 
 50
 We reject the contention that interest is payable from the date the tax was collected.
 
 
 51
 As an alternative theory, Greyhound that the language '(without interest)' in both 6416(b) and 6421(b), has no application to refund claims which are erroneously rejected or deemed rejected, and that interest should be allowed from the date of rejection. We agree.
 
 
 52
 Closely in point is General Dynamics Corp. v. United States, 324 F.2d 971, 163 Ct.Cl. 219 (1963), in which the court ruled that a statutory provision prohibiting the payment of interest on a credit or refund was not applicable and that interest should be paid. True enough, General Dynamics involved a tax which was wrongfully collected in the first instance. Be that as it may, we can draw no meaningful distinction between the allowance of interest under such circumstances and the allowance of interest where the government has wrongfully rejected a legitimate claim for refund. To hold otherwise would encourage the Internal Revenue Service to postpone action on this type of claim, or reject, it, knowing there would be nothing to lose.
 
 
 53
 The cases are remanded to the lower court for computation of interest on the respective refunds from the date of erroneous rejection or when deemed rejected under the statute and regulations. Otherwise, the respective judgments are affirmed.
 
 KOELSCH, Circuit Judge (dissenting):
 
 54
 I have no quarrel with my brothers in their view that the government should give financial encouragement to all persons who, by providing transportation services to commuters, espose themselves to the attendant financial risks.
 
 
 55
 But I am unable to read into 26 U.S.C. 6416(b)(2)(H) and 6421(b) any such Congressional mandate; the plain language of these provisions more narrowly restricts this financial aid.
 
 
 56
 Both sections 6416(b)(2)(H) and 6421(b)(1) authorize tax rebates for fuel[1] used in vehicles 'while engaged in furnishing scheduled common carrier public passenger land transportation service along regular routes.' The allowances are thus made potentially available to any operator of a public transportation, or transit, system.
 
 
 57
 However, 6421(b)(2), which is incorporated in 6416(b)(2)(H),[2] limits its benefits to the operators of transit systems falling within a specific class, i.e., the class of transit systems which are sufficiently 'local' in nature to satisfy the '60 percent' test set forth in that subsection. A claimant is entitled to the relevant allowance 'only if at least 60 percent of the total passenger fare revenue derived during . . . (the relevant) quarter from scheduled service described in paragraph (1) by the person filing the claim was attributable to commuter fare revenue derived during such quarter by such person from such scheduled service.'
 
 
 58
 It is implicit in both statutes that any 'person' furnishing 'scheduled common carrier public passenger land transportation service along regular routes' operates a 'transit system,' though neither statute specifically employs that latter phrase in its text. The majority misconstrues 6421(b)(2) when it permits Greyhound, in applying the '60 percent' test, to divide its system by excluding from its 'total passenger fare revenue' all revenue derived from its mainline service operations, for clearly Greyhound, and not a chosen segment of its transportation operations, is the 'person filing the claim' within the meaning of the statute. 26 U.S.C. 7701(a)(1).[3] The significance of this insight is not merely that 'Greyhound was . . . a proper claimant under 6421(b) (2),' as the majority observes, but that Greyhound's own 'total passenger fare revenue' derived from its own 'scheduled common carrier public passenger land transportation service along regular routes' must be considered in applying the '60 percent' test.
 
 
 59
 Insofar as the findings of the trial court establish that Greyhound operates two distinct types of trrnsapportation service, the findings are undisputed by the government and immaterial to the question before the court. The fact that one type of transportation service is operated by a separate and distinct department of a transit company, with separate employees and equipment, and the maintenance of separate accounting, does not justify the exclusion from 'total passenger fare revenue' of the revenue derived therefrom. Rev.Rul. 67-92, 1967-1 Cum.Bull. 361. Moreover, the distinction between 'local' and 'mainline' service found by the trial court and upheld by the majority has no basis in the statute; it is authored by the management of the company making the claim. The only relevant distinction between types of transportation service contained in the statute is that between service from which 'sommuter fare revenue (is) derived' and service from which the claimant's 'total passenger fare revenue (is) derived.' If revenue from the former exceeds 60 percent of revenue from the latter, the test is met.
 
 
 60
 Insofar as the trial court concluded that Greyhound operates two distinct transit systems and may therefore claim the statutory allowance on behalf of one of them without reference to the revenue of the other, it was in error, for the statute, in its plain terms, contemplates that a claimant furnishing 'scheduled common carrier public passenger land transportation service along regular routes' derives its 'total passenger fare revenue' from the totality of its passenger transportation operations.
 
 
 61
 While the majority observes that the title to an Act may not be employed to limit the plain language of the text, it nevertheless attaches considerable significance to the headings of 6421 ('Gasoline Used for Certain Nonhighway Purposes or by Local Transit Systems') and subsection (b) ('Local Transit Systems'). However, its discussion overlooks the interpretation of the operative text, wholly consistent with the headings, that subsection (b)(1) authorizes an allowance for operators of transit systems which are sufficiently 'local' or commuter-oriented in nature to qualify under the '60 percent' test of subsection (b)(2). Thus, subsection (b)(2) merely sets forth the statutory definition of a qualifying or 'local' transit system, and the heading of 6421(b) refers to such qualifying systems, all other systems being beyond the coverage of the statute. Similarly, gasoline used by other than qualifying systems is not 'Gasoline Used . . . by Local Transit Systems.' However, the headings need not, and should not, be considered since the language of the operative text is plain and unambiguous.
 
 
 62
 The majority derives little assistance from its citation of Public Service Coordinated Transport v. United States, 367 F.2d 417, 177 Ct.Cl. 337 (1966). That decision makes but passing reference to the '60 percent' limitation of 6421(b)(2) and does not attempt to construe it; rather, the court construes the phrase 'bus which is of the transit type' contained in a different statute, 26 U.S.C. 4483(c). Moreover, that latter statute provides that a 'person,' and not a system, meets the '60 percent' test.[4]
 
 
 63
 Nor is the majority's position enhanced by the relevant Treasury Regulations. The primary regulation explaining the '60 percent' test, 26 C.F.R. 48.6421(b)-1(b), makes clear that it is the 'total passenger fare revenue' of 'the person filing a claim for payment' which must be considered.[5] Other regulations, 26 C.F.R. 48.6421(c)-1(a)(1), (a)(2), (b)(1), and (b)(2)(ii), all cited by the majority, stand not for the proposition that claims are to be submitted by local transit systems, but that the allowance is available on fuel used 'by local transit systems.' Even assuming arguendo that claims are intended to be submitted by 'transit systems,' these regulations provide no authority that Greyhound operates a 'local' or qualifying transit system as contemplated by the statute. Further, 26 C.F.R. 48.6421(c)-1(b)(2)(ii)(i) requires that the claim set forththe 'internal revenue district in which the claimant's last income tax return was filed.'
 
 
 64
 Another provision, 26 C.F.R. 48.6421(b)-1(d), presents an illustration containing the following language:
 
 
 65
 'Example. The XYZ Corporation operates a local transit system furnishing scheduled common carrier public passenger land transportation service along regular routes in the city of Grandville and also operates a similar intercity service to Jonesboro.'
 
 
 66
 Although this language may arguably be read to mean that XYZ Corporation's local service operations in Grandville constitute a distinct local transit system, it is manifest that such a 'system' is neither a proper claimant under subsection (b)(2) nor an entity on whose behalf a claim may be made, for the example goes on to demonstrate that XYZ Corporation, as the 'person filing the claim,' must include both its local and intercity operations in computing its 'total passenger fare revenue' under the test. The hypothetical XYZ Corporation is a virtual microcosm of Greyhound, and thus it follows from the example that Greyhound must include revenue from both its local and mainline operations in determining its 'total passenger fare revenue' under the test.
 
 
 67
 I find nothing in the regulations inconsistent with the construction of the statute presently advanced by the government. Nor does the majority help itself by giving the regulations a contrary interpretation; the plain language of the statute stands as a compelling indication that such a contrary interpretation is wrong.
 
 
 68
 I cannot seriously dispute the majority's conclusion that Congress, in enacting 6421(b), sought to provide relief for mass transportation systems. This is undoubtedly true. Nevertheless, the question before the court is whether Greyhound provides transportation service of the type and degree which, under the statute, entitles it to the allowance. The legislative history of the statute leaves little doubt that Greyhound does not provide such service.[6]
 
 
 69
 Moreover, nothing in the legislative history sustains the proposition that all operators of transit systems providing some commuter service are entitled to the allowance. The very mode of enactment mandates the other conclusion. If Congress had intended that all systems providing some commuter service receive the allowance, it could easily have done so. Instead, it created the '60 percent' limitation.
 
 
 70
 In holding that the provider of any service from which 'commuter fare revenue (is) derived' is entitled to make its claim on behalf of a segment of its transportation operations almost identical to that from which the 'commuter fare revenue (is) derived,' the majority rewrites the statute and substantially destroys the significance of the '60 percent test. In so holding, it reads Greyhound's own company distinction between 'local' and 'mainline' operations into the statute and imposes the burden of that distinction on other potential claimants which may be organized differently from Greyhound.[7]
 
 
 71
 I am compelled to conclude that Greyhound, a transportation corporation which concededly derives over 95 percent of its substantial passenger fare revenue from intercity, interstate, and transcontinental operations, is not one of the 'persons' which Congress sought to aid in enacting 6416(b)(2)(H) and 6421(b). I would therefore reverse the judgments of the district court and remand the causes with directions that judgments be entered in favor of the government. Because the government should prevail, I express no view on the issue of interest.
 
 
 
 [1]
 '6421. Gasoline Used For Certain Non-highway Purposes or by Local Transit Systems
 (b) Local transit systems.--
 (1) Allowance.-- Except as provided in subsection (i), if gasoline is used during any calendar quarter in vehicles while engaged in furnishing scheduled common carrier public passenger land transportation service along regular routes, the Secretary or his delegate shall, subject to the provisions of paragraph (2), pay (without interest) to the ultimate purchaser of such gasoline the amount determined by multiplying--
 (A) 1 cent for each gallon of gasoline so used on which tax was paid at the rate of 3 cents a gallon and 2 cents for each gallon of gasoline so used on which tax was paid at the rate of 4 cents a gallon, by
 (B) the percentage which the ultimate purchaser's commuter fare revenue derived from such scheduled service during such quarter was of his total passenger fare revenue derived from such scheduled service during such quarter.
 (2) Limitation.-- Paragraph (1) shall apply in respect of gasoline used during any calendar quarter only if at least 60 percent of the total passenger fare revenue derived during such quarter from scheduled service described in paragraph (1) by the person filing the claim was attributable to commuter fare revenue derived during such quarter by such person from such scheduled service.
 (d) Definitions.-- For purposes of this section--
 (2) Commuter fair revenue.-- The term 'commuter far e revenue' means revenue attributable to fares derived from the transportation of persons and attributable to--
 (A) amounts paid for transportation which do not exceed 60 cents,
 (B) amounts paid for commutation or season tickets for single trips of less than 30 miles, or
 (C) amounts paid for commutation tickets for one month or less.'
 
 
 [2]
 'It is manifest from the testimony adduced at trial and the Partial Agreed Statement of Facts and the elaborate briefs filed by the respective parties, that Greyhound operates two separate types of service, mainline and local. Public Service Coordinated Transport v. United States, 367 F.2d 417, 177 Ct.Cl. 337 (1966); see also, Plaintiff's Exhibit 9 'Local operations.' The detailed testimony of the several trial witnesses produced by plaintiffs makes it abundantly clear that Greyhound's local service meets the criteria in Exhibit 9
 'Plaintiffs have successfully met and sustained the burden of proof in the clear and convincing exposition of fact and the delineation of legal principles as applicable.
 'The United States vigorously contends that Greyhound is nevertheless a single, unified and integrated transportation system. However, there is no persuasive evidence, either oral or documentary, to support this contention.' (Greyhound Brief, p. 7).
 
 
 [3]
 (1) Masses of passengers are transported during rush hours; (2) Rush hour passengers are transported primarily to and from work; (3) Frequency of service is highest during rush hours and drops off in between those hours; (4) Relatively short distances are traveled by the average passenger; (5) Fares are determined by zones; (6) Limited baggage facilities are offered; (7) Services between suburban areas and core cities; (8) Operating speed may be relatively slower than that of intercity buses; (9) Passenger comfort may be of lower concern than that of intercity buses
 
 
 [4]
 70 Stat. 394
 'Sec. 6421. Gasoline Used For Certain Nonhighway Purposes or by Local Transit Systems.
 (a) Nonhighway uses.-- If gasoline is used otherwise than as a fuel in a highway vehicle (1) which (at the time of such use) is registered, or is required to be registered, for highway use under the laws of any State or foreign country, or (2) which, in the case of a highway vehicle owned by the United States, is used on the highway, the Secretary or his delegate shall pay (without interest) to the ultimate purchaser of such gasoline an amount equal to 1 cent for each gallon of gasoline so used.
 (b) Local Transit Systems.--
 (1) Allowance.-- If gasoline is used during any calendar quarter in vehicles while engaged in furnishing scheduled common carrier public passenger land transportation service along regular routes, the Secretary or his delegate shall, subject to the provisions of paragraph (2), pay (without interest) to the ultimate purchaser of such gasoline the amount determined by multiplying--
 (d) (2) Definitions.-- For purposes of this section--
 (1) Gasoline.-- The term 'gasoline' has the meaning given to such term by section 4082(b).
 (2) Tax-Exempt Passenger Fare Revenue.-- The term 'tax-exempt passenger fare revenue' means revenue attributable to fares which were exempt from the tax imposed by section 4261 by reason of section 4262(b) (relating to the exemption for commutation travel, etc.). * * *'
 
 
 [1]
 26 U.S.C. 6416(b)(2)(H) refers to 'a liquid in respect of which tax was paid under section 4041,' while 6421(b)(1) refers to 'gasoline.'
 
 
 [2]
 Greyhound's claim for a diesel fuel tax refund is made under 6416(b)(2)(H) and is allowable, under that section, 'only if the 60 percent passenger fare revenue test set forth in section 6421(b)(2) is met.'
 
 
 [3]
 26 U.S.C. 7701 provides in pertinent part:
 '7701. Definitions.
 (a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof--
 (1) Person.-- The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.'
 
 
 [4]
 26 U.S.C. 4483 provides in pertinent part:
 '4483. Exemptions
 (c) Certain transit-type buses.-- Under regulations prescribed by the Secretary or his delegate, no tax shall be imposed by section 4481 on the use of any bus which is of the transit type (rather than of the intercity type) by a person who, for the last 3 months of the preceding year (or for such other period as the Secretary or his delegate may be regulations prescribe for purposes of this subsection), met the 60-percent passenger fare revenue test set forth in section 6421(b)(2) as applied to the period prescribed for purposes of this subsection.'
 
 
 [5]
 26 C.F.R. 48.6421(b)-1(b) provides in pertinent part:
 '(b) 60-percent passenger fare revenue test. For purposes of section 6421 and this section, the '60-percent passenger fare revenue test' is met in a particular calendar quarter if during the calendar quarter the person filing a claim for payment under section 6421(b)--
 (1) Derived passenger fare revenue from the operation of scheduled common carrier public passenger land transportation service along regular routes, and
 (2) At least 60 percent of the total passenger fare revenue was commuter fare revenue.'
 
 
 [6]
 The following excerpts from the legislative history of the statute serve to highlight Congressional intent:
 'Under the bill, refunds are available with respect to motor fuel used in vehicles while such vehicles are engaged in furnishing scheduled common carrier public passenger land transportation service along regular routes. However, the refund is to be available only if at least 60 percent of the total passenger-fare revenue (exclusive of any transportation of persons tax) of the carrier was attributable to fares which presently are exempt from the excise tax on the transportation of persons on the grounds that they do not exceed 35 cents or that they constitute commutation fares.' H.R.Rep. No. 2022, 84th Cong., 2d Sess., 1956-2 Cum.Bull. 1289.
 'For example, a transit company is authorized to serve the city of A and the nearby communities of B, C, D, and E. Its total passenger-fare revenue from all of its scheduled service along regular routes for the period prescribed by the Secretary or his delegate is $100,000 . . .. Of this total passenger-fare revenue for the period, $72,000 is attributable to fares which are exempt from the tax on transportation of persons by virtue of the provisions of section 4262(b) of the 1954 Code.
 'The company would qualify for relief . . ., since 72 percent of its revenues during the prescribed period was from fares exempt from tax.'
 Id. at 1305.
 'Under the House Bill special relief was provided in the case of the gasoline, diesel fuel, and special motor fuel taxes for fuel used in the operation of local transportation systems. The relief was granted through the form of a refund . . . where the fuel was used in vehicles engaged in furnishing scheduled common carrier, public passenger, land transportation service along regular routes. In such cases the refund was to be available only if 60 percent or more of the total passenger fare revenue of the carrier was attributable to fares exempt from the excise tax on the transportation of persons (on the grounds that they do not exceed 35 cents or that they constitute commutation fares).' S.Rep.No.2054, 84th Cong., 2d Sess., 1956-2 Cum.Bull. 1311.
 
 
 [7]
 Nothing in the legislative history of the statutes remotely suggests that in enacting the legislation Congress was cognizant of the internal organization of a transportation company such as Greyhound which may have distinguished between 'local' and 'mainline' operations