127 T.C. No. 7

UNITED STATES TAX COURT


MEDICAL TRANSPORTATION MANAGEMENT CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ZUNI TRANSPORTATION, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 10699-04, 10700-04.    Filed September 19, 2006.


　　　　Ps operated paratransit services during the
taxable years in question.  Ps used sedans and vans to
provide transportation to their clients.  Ps' service
was exclusively provided to disabled persons.  The
routes Ps' drivers traveled were determined with
respect to daily manifests generated every evening that
accommodated the transportation needs of their clients.
Ps claimed a credit under sec. 34, I.R.C., for gasoline
taxes paid under sec. 4081, I.R.C.  R asserted
deficiencies denying them the sec. 34, I.R.C. credit.
R denied the credit because according to R's notice of
deficiency, Ps' service did not meet the requirements
under sec. 6421, I.R.C., which sec. 34, I.R.C. cross-
references.  In order to qualify for the credit, Ps
must demonstrate under sec. 6421, I.R.C., that (1) Ps
provided transportation in an "automobile bus", (2) Ps'
transportation was available to the general public, and
(3) Ps' transportation was scheduled along regular
routes.

Held:  Ps fail to meet the requirements under section 6421, I.R.C.  Ps' sedans do not qualify as a "bus". Even though Ps' vans may potentially qualify, Ps were unable to produce any evidence that quantifies how many gallons of gasoline are attributable to each type of vehicle.

Held, further, Ps' service was not scheduled along regular routes.

Jose A. Saavedra, for petitioners.

Justin L. Campolieta, for respondent.

OPINION

GOEKE, Judge:  Respondent determined the following deficiencies in petitioners' Federal income tax:

Medical Transportation Management Corp. - docket No. 10699-04

| Year | Deficiency |
| --- | --- |
| 1998 | $58,673 |
| 1999 | 62,000 |

Zuni Transportation, Inc. - docket No. 10700-04

| Year | Deficiency |
| --- | --- |
| 1998 | $32,758 |
| 1999 | 21,852 |

The issue in this case is petitioners' entitlement to an income tax credit under section 34(a)(2) for gasoline excise tax refundable with respect to certain uses under section 6421.[1]  We hold that petitioners are not entitled to the credit.

## Background

Petitioners are for-profit Florida corporations with their principal places of business and mailing addresses in Miami, Florida, at the time their petitions were filed.  During the 1998 and 1999 taxable years, petitioners provided paratransit services for the physically and mentally disabled within Miami-Dade County, Florida, and portions of southern Broward County, Florida.  The services petitioners provided were in fulfillment of their duties under a contract with Cosmis Mobility Services, Inc. (Cosmis).  Cosmis is the transportation services broker for Miami-Dade County.  Cosmis was under contract with the Metro-Dade Transit Authority (Transit Authority) to obtain transportation for the physically and mentally disabled to meet the requirements of the Americans With Disabilities Act of 1990 (ADA), Pub. L. 101-336, 104 Stat. 327.  Petitioners had no contractual relationship with the Transit Authority.

Petitioners provided paratransit services exclusively through the use of vans and sedans with seating capacities of

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

fewer than 20 adults, including the driver.  Petitioners provided no evidence which permits the allocation of their gasoline usage between sedans and vans.

Petitioners' paratransit services were only available to members of the general public who were certified as disabled under the ADA.  The vast majority of petitioners' passengers were individuals requiring transportation within Miami-Dade County.

Disabled passengers requiring paratransit services within Miami-Dade County could either make a reservation or set up a subscription.  A reservation entailed a one-time ride between two points.  Passengers were required to place the reservation at least 24 hours in advance, as well as designate the pickup and dropoff locations, and request a date and time for travel.  A subscription service was available if the same trip was taken at the same day and time, at least once a week, week after week.  For example, an individual who worked at a particular site for set days and times would obtain a subscription to be picked up and dropped off at the worksite, and picked up and dropped off at home, for the days of the week he or she selected, for the weeks he or she selected.  Once a subscription was in place, it was no longer necessary for passengers to phone ahead and reserve transportation.  Subscription service riders were also initially required to designate the initial pickup and dropoff locations and times.  On any given day of travel, petitioners might have

been required to provide "on-demand service" to passengers who were not listed in the original manifest but for medical reasons required immediate transportation.

Prior to each day's operation, Cosmis would obtain the necessary pickup information for each prospective passenger. Petitioners' contract with Cosmis required that petitioners maintain a listing of every trip dispatched and delivered. Cosmis would schedule these rides at least the night before the ride and download the information to petitioners before the travel day. The information was set out in a daily travel manifest containing the specified schedule to be followed and used exclusively for that specific day. A new daily manifest was generated for each new travel day. Typical daily manifests would contain both reservation and subscription passengers. For each travel day, the daily manifest would contain the specific locations and times of the pickups and dropoffs. The information on daily manifests was subject to change from day-to-day based on daily passenger reservations and subscriptions. A daily manifest might or might not have included a stop that had been included on a previous or subsequent daily manifest. The specific routes traveled and schedules followed by petitioners' sedans and vans were derived from passenger subscriptions and daily reservations. The manifests did not contain the specific routes to be followed; the manifests only listed the names of the passengers and the

times and locations of passengers' pickups and dropoffs.  The
drivers of the paratransit vehicles were not required to follow
any particular route in servicing a run.

For the 1998 and 1999 taxable years, petitioner Medical
Transportation Management Corp. (MTMC) claimed income tax credits
of $58,673 and $62,000, respectively, for excise taxes it paid on
gasoline.  For the same taxable years, petitioner Zuni
Transportation, Inc. (Zuni), claimed income tax credits of
$32,758 and $21,852, respectively.  On March 25, 2004, respondent
timely mailed separate notices of deficiency denying petitioners
the entire gasoline credit amount, and provided the following
identical explanation:

> It is determined that you do not meet the requirements
> for the fuel credit for gasoline under section 6421(a)
> of the Internal Revenue Code because you did not
> operate qualified buses on scheduled or fixed routes,
> and the buses were not available to the general public.

Petitioners filed separate petitions with this Court seeking
a redetermination.  In their respective petitions, petitioners
asserted that they met all of the requirements set forth in
section 6421(b) and therefore were entitled to the income tax
credit under section 34(a).

Discussion

## I.   Background on Section 34 Credit

Section 34 provides a credit against tax for the amount of
excise taxes included in the price of gasoline to the ultimate

purchaser of gasoline used on a farm for farming purposes, for other off-highway business use, by local transit systems, and by the operators of intercity, local, or school buses.  See secs. 34, 6420, 6421.

Section 34(a) provides in relevant part:

> SEC. 34(a) General Rule.--There shall be allowed as a credit against the tax imposed by this subtitle for the taxable year an amount equal to the sum of the amounts payable to the taxpayer--

>     *      *      *      *      *      *      *

> (2) under section 6421 with respect to gasoline used during the taxable year (A) otherwise than as a fuel in a highway vehicle or (B) in vehicles while engaged in furnishing certain public passenger land transportation service * * *

Section 6421(b) provides in relevant part:

> SEC. 6421(b) Intercity, Local, or School Buses.--

> (1) Allowance.--Except as provided in paragraph (2) and subsection (i), if gasoline is used in an automobile bus while engaged in--

> (A) furnishing (for compensation) passenger land transportation available to the general public * * *

>     *      *      *      *      *      *      *

> the Secretary shall pay (without interest) to the ultimate purchaser of such gasoline an amount equal to the

> product of the number of gallons of gasoline so used multiplied by the rate at which tax was imposed on such gasoline by section 4081.
>
> (2) Limitation in case of nonscheduled intercity or local buses.--Paragraph (1)(A) shall not apply in respect of gasoline used in any automobile bus while engaged in furnishing transportation which is not scheduled and not along regular routes unless the seating capacity of such bus is at least 20 adults (not including the driver).

Petitioners argue that they would be entitled to a payment under section 6421(b)(1)(A) and therefore entitled to claim an income tax credit under section 34(a)(2). Respondent contends that petitioners do not meet the requirements for claiming a payment under section 6421(b)(1)(A).

There are three essential elements to a claim for payment under section 6421(b)(1)(A) in situations (like this one) where the seating capacity of each vehicle is fewer than 20 adults. A taxpayer must establish that the excise tax was paid on gasoline (1) used in an automobile bus, (2) while engaged in furnishing (for compensation) passenger land transportation available to the general public, and (3) which was scheduled along regular routes. See sec. 6421. We shall address these elements separately.

II. "Automobile Bus" Requirement

Petitioners argue that the vans and 4-door sedans used to transport passengers qualify as "buses". Whether a sedan or van

may qualify as an automobile bus under section 6421 is an issue of first impression. The term "bus" for purposes of section 6421 is not defined in the Code, the applicable regulations, or the legislative history. The legislative history suggests that Congress intended to limit the scope of section 6421 to buses. Section 6421 was added to the Code by section 208(c) of the Federal-Aid Highway Act of 1956, Pub. L. 84-627, 70 Stat. 394. As enacted, section 6421(b)(1) originally provided for a payment of excise tax "If gasoline is used * * * in vehicles while engaged in furnishing scheduled common carrier public passenger land transportation service along regular routes". The applicable version of section 6421(b) was amended by section 233(a) of the Energy Tax of 1978, Pub. L. 95-618, 92 Stat. 3190 (1978 amendment). The word "vehicles" was replaced with "automobile buses". The Senate report explains that "Since bus transportation is more energy-efficient than private automobile transportation, the committee believes it desirable to encourage greater use of bus transportation." S. Rept. 95-529, at 54 (1977), 1978-3 C.B. (Vol. 2) 199, 246. Although Congress made clear its intent to limit the application of the statute to buses, it never defined the word "bus". We therefore assume that Congress intended the word "bus" to carry its "'ordinary, contemporary, common meaning.'" Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. Pship., 507 U.S. 380, 388

(1993)(quoting <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979));
see also <u>Crane v. Commissioner</u>, 331 U.S. 1, 6 (1947) ("Words of
statutes--including revenue acts--should be interpreted where
possible in their ordinary, everyday senses").  Therefore, we
shall look to the ordinary meaning of the word "bus" to determine
whether petitioners' sedans and vans qualify as buses.

In determining the ordinary meaning of a statutory term, we
first look to the ordinary usage or settled meanings of the words
used in the statute by Congress.  <u>Hamm v. James</u>, 406 F.3d 1340,
1343 (11th Cir. 2005); <u>Hefti v. Commissioner</u>, 97 T.C. 180, 193
(1991), affd. 983 F.2d 868 (8th Cir. 1993).  The word "bus" is
short for the word "omnibus" and is commonly defined as "a large
motor-driven vehicle designed to carry passengers usu. according
to a schedule along a fixed route".  Webster's Third New
International Dictionary (1993); see also Webster's Tenth New
Collegiate Dictionary (2002) for a similar definition.  We
address whether the vehicles petitioners use meet the definition
of "fixed" or "regular" routes in detail <u>infra</u> pp. 16-20 in
examining whether petitioners meet the third requirement for
obtaining the credit.  Notwithstanding the question of fixed
routes, we do not believe that the 4-passenger sedans petitioners
used qualify as large motor vehicles.  Petitioners submitted
closeup photographs of the sedans in question, and it is fairly
obvious that the vehicles are not large, even for a sedan.

The definition of the word "omnibus" also does not favor petitioners.  The word "omnibus" is defined as "a public vehicle usu. automotive and 4-wheeled and designed to carry a comparatively large number of passengers."  Webster's Third New International Dictionary (1993).  Although the description of "omnibus" as 4-wheeled plausibly includes a sedan, the sedans petitioners used would not be able to carry a large number of passengers.

Petitioners argue that because Congress used the term "automobile bus" and not just "bus" in the statute, they must have meant something more expansive than a traditional "bus".  Petitioners justify this construction with several different arguments, all of which we reject.

A.   The Prefix "Automobile" Does Not Modify the Meaning of "Bus"

Petitioners argue that because the word "automobile" precedes the word "bus" in the statute, Congress must have intended a more expansive definition than the ordinary meaning of the word "bus".  Petitioners offer no definition of the phrase "automobile bus", but they simply conclude that "the term 'automobile bus' does not seem to have any significance such that any vehicle, including sedans and vans, qualify * * * if the vehicles were used for transportation which is regularly scheduled.'"  This premise clearly violates "'a cardinal principle of statutory construction' that 'a statute ought, upon

the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)). Further, petitioners' contention that the word "automobile bus" is insignificant also renders the 1978 amendment substituting automobile bus for vehicle superfluous. One of the stated purposes of the 1978 amendment was to "encourage greater use of bus transportation." S. Rept. 95-529, supra at 54, 1978-3 C.B. (Vol. 2) at 246. We cannot ignore the overwhelming evidence of deliberate intent to include the word "bus" in the statute. Therefore, we reject petitioners' argument. After arguing that the term "automobile bus" has no significance in the statute, petitioners argue in the alternative that we should accept their proffered plain meaning of "automobile bus". Petitioners surmise that Congress meant to use the word "automobile" in its noun form to describe the traits that the word "bus" is supposed to have. The noun form of "automobile" is commonly defined as a "four-wheeled automotive vehicle". Webster's Third New International Dictionary (1993). Together with the word "bus", petitioners conclude that Congress meant to include all four-wheeled vehicles which travel on regular routes in defining what vehicles qualify for the exemption. Respondent argues that Congress meant the

adjective form of "automobile" to describe bus, which is commonly defined as "automotive", meaning "containing within itself the means of propulsion".  Id.

We agree with respondent's interpretation.  There is no evidence that Congress intended the plain meaning of "automobile" to alter or expand the plain meaning of the word "bus".  The legislative history accompanying section 6421 clarifies that Congress meant only buses should qualify for the credit:  "the bill provides for the refund or credit of the taxes paid on gasoline and other motor fuels but only to the extent these fuels are used in a bus engaged in furnishing (for compensation) passenger land transportation available to the general public".  S. Rept. 95-529, supra at 56, 1978-3 C.B. (Vol. 2) at 248 (emphasis added).  Even if we were to accept petitioners' interpretation of the word "automobile bus", petitioners would not meet their own definition because as discussed infra pp. 16-19, the transportation petitioners provided was not on fixed or regularly scheduled routes.[2]

    B.    The Legislative History to Section 6421 Does Not Support Petitioners' Interpretation

Petitioners argue that the following language from the

---

[2]Respondent cites extensive legislative history that shows how the word "automobile" has been used as a modifier in various statutes predating the Code.  While that argument may have some merit, we find that it is not dispositive and therefore does not control our analysis.

legislative history accompanying the 1978 amendment of section 6421 supports their expansive definition of "automobile bus":

<u>Explanation of provisions</u>

The bill removes the excise taxes on highway tires, inner tubes, and tread rubber, gasoline and other motor fuels, and lubricating oil for private intercity, local and school bus operations.

　　　*　　*　　*　　*　　*　　*　　*

An "intercity or local bus" means any bus which is used predominantly in furnishing (for compensation) passenger land transportation available to the general public if either (1) the transportation is scheduled and along regular routes, or (2) the passenger seating capacity of the bus is at least 20 adults (not including the driver). Thus, under the first alternative portion of this definition, a bus which is used predominantly (that is, more than 50 percent) in providing (for compensation) scheduled transportation along regular routes (such as is provided by local transit systems or an intercity bus operation providing regularly scheduled service along regular routes) will qualify for the exemption from the taxes on tires, tubes, and tread rubber, regardless of the size of the bus involved. For nonscheduled (i.e., charter) operations (covered by the second alternative portion of the definition), the exemption is available only if the bus has a passenger seating capacity of at least 20 adults (not including the driver) and the transportation is available to the general public. The purpose of the "at least 20 passenger" requirement is to insure that, in situations where regularly scheduled

service is not being furnished, vans and similar vehicles used for vanpooling or taxi service are not eligible for the exemption from these taxes (and the fuels taxes).

S. Rept. 95-529, supra at 55, 1978-3 C.B. (Vol. 2) at 247.[3]

Petitioners claim that the "predominant use" language in the legislative history allows them to qualify under the first alternative definition so long as the transportation they provide is scheduled along regular routes.  We disagree.

Prior to "construing the statute so as to override the plain meaning of the words used therein" this Court requires "unequivocal evidence of legislative purpose".  Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984).  The excerpt petitioners cites, in our opinion, does not constitute "unequivocal evidence" of legislative intent to override the plain meaning of the words used in the statute.  In addition, the language petitioners cite still requires that there is a "bus which is used predominantly".  S. Rept. 95-529, supra at 55,

---

[3]Respondent argues that the predominant use sentence does not apply to sec. 6421 because the language in that sentence does not specifically mention gasoline or fuel taxes.  We disagree. Since the first and last paragraphs both mention gasoline and fuel taxes, we conclude that the entire explanation pertains to both secs. 6421 and 4221 and do not find that particular omission significant.  Petitioners also cite the language in sec. 48.4221-8(b)(2), Excise Tax Regs., to support their interpretation of the "bus" and "regular route" requirements.  Since that language is substantially the same as the language in the Senate report, we subsume its analysis in the arguments based on the language in the Senate report without reaching the question of whether those regulations are applicable.

1978-3 C.B. (Vol. 2) at 247 (emphasis added).  The legislative history does not define "bus", which leaves us with the ordinary meaning of the word "bus" that we have already stated petitioners do not qualify under.

We conclude that the sedans do not qualify as "buses".  Even though the legislative history petitioners cite plausibly includes vans, we do not need to evaluate whether any vans petitioners used qualify as buses because our finding that sedans are not buses precludes an application of the credit.  Petitioners failed to give an accounting of how many gallons of gas to attribute to each type of vehicle for purposes of the gasoline credit.  See sec. 6421(b)(1).  Therefore, even if we were to hold that vans qualify as buses, petitioners fail to qualify for the gasoline credit because we have no way of discerning how many gallons of gasoline were used by either type of vehicle.[4]

III.  "Regular Route" Requirement

Since petitioners did not use gasoline in an "automobile bus," they are not entitled to an income tax credit under section 34(a)(2).  Nevertheless, for the sake of completeness, we shall determine whether petitioners provided transportation that meets

---

[4]Neither party has raised the question of burden of proof, but petitioners have the initial burden of coming forward with evidence.  Rule 142(a).

the "regular route" requirement.[5]  Under section 6421(b), transportation must be scheduled "along regular routes" unless the seating capacity of the bus is at least 20 adults. Petitioners concede that all of the vehicles at issue seated under 20 adults.  Therefore, the issue is whether petitioners provided transportation scheduled along regular routes.  The Senate report issued in conjunction with the Energy Tax Act of 1978 states that in order for service to qualify as scheduled and on regular routes under the statute, the service must provide "scheduled transportation along regular routes (such as is provided by local transit systems or an intercity bus operation providing regularly scheduled service along regular routes)".  S. Rept. 95-529, supra at 55, 1978-3 C.B. (Vol. 2) at 247. Petitioners fail to satisfy this requirement.

Unlike typical local transit systems, there were no published timetables available to the general public that the sedans and vans were required to follow.  The schedules were prepared the night before the travel day.  Although petitioners' services were provided on a daily basis, they did not follow a regular schedule, nor were the routes they traveled "regular".  A stop that was listed on a previous day's manifest might or might not have appeared on a subsequent manifest.  The existence of

---

[5]Respondent no longer contests the "available to the general public" requirement.

reservation passengers and the unpredictability of subscription changes, additions, and cancellations guaranteed that the routes would vary significantly from one day to the next. Such variable scheduling by its nature cannot be considered to constitute a "regularly scheduled service along regular routes".

Petitioners again rely on the "predominant use" found in the Senate report to argue that the transportation was serviced along regular routes. Petitioners argue that the implication of that language, which was set forth supra p. 14 suggests that if a bus is used over 50 percent in providing scheduled transportation along regular routes, then it qualifies under section 6421. Based upon the premise that over 50 percent of their services were subscription riders, petitioners argue that they meet the "predominant use" standard.

Petitioners' argument contains several flaws. First, petitioners failed to establish that their vans and sedans were used more than 50 percent in furnishing subscription services. Petitioners attempted to elicit such information from their witnesses at trial; however, neither the president of Zuni nor the general manager of MTMC could provide that information based on personal knowledge or any other credible source.[6] Second,

---

[6]The most that these witnesses could account for is an estimate that over 50 percent of the clients were subscription passengers. The witnesses admitted that they did not know exactly (beyond an "informed guess") what percentage of the

(continued...)

even if we accepted that premise as fact, it does not impact our finding that the routes traveled by petitioners were not regular. Even with respect to manifests that contained only subscription passengers, to the extent that they existed, it was possible that passengers could change from one week to the next as a result of cancellations or new subscriptions. As evidenced at trial through the testimony of the general manager of Cosmis, there was no way of knowing, short of asking the driver, whether the vehicle followed the same or similar routes as the corresponding run on a subsequent day or week. Petitioners conceded that the information on the daily manifests was subject to change from day-to-day based on daily passenger reservations and subscriptions. An examination of the daily manifests submitted in the record reveals that no two manifests contained substantially similar patterns of destinations traveled or pickup/dropoff times.[7] The manifests had to be modified on a daily basis to accommodate all of the changes in the needs of the

_____

[6](...continued)
riders were subscription and what percentage were reservation.

[7]The most that can be said about the regularity of the routes traveled as evidenced in the manifests submitted is that in a given week several addresses appeared more than once and in some instances at the same time of day. However, the record is devoid of any instance where the same route was traveled from start to finish more than once. In the sample manifests provided, after a painstaking examination, there is an occasional cluster of addresses that show up more than once a week, but otherwise the routes are completely different.

passengers using petitioners' services no matter whether they were regular subscribers or one-time reservation passengers. We conclude that the transportation service petitioners provided, by its very nature, requires irregularity in the routes and schedules to function properly.[8]

## IV. The ADA Does Not Govern Our Determination

Petitioners argue that it would frustrate the purpose of the ADA to disallow petitioners' claimed gasoline tax credit. Petitioners further argue that the term "scheduled and along regular routes" should be read in light of the paratransit regulations enacted under the ADA. We disagree. The ADA is not a taxing statute, and therefore it has no applicability to whether petitioners qualify for a credit against their income taxes under section 34. The particular paratransit service petitioners provide qualifies under neither the plain language of section 6421 nor the stated legislative intent. We may not rewrite any of these provisions.

---

[8]In their brief, petitioners offer creative constructions of "scheduled" and "regular routes" based upon various dictionary definitions. We decline to address these arguments here because we find that the legislative history clarifies what type of service Congress considered to be "scheduled" along "regular routes". Petitioners' proffered plain meaning argument lacks merit. Further, based on their argument, petitioners conclude that "regularly" means traveling the same route two or three times a week. Petitioners failed to establish that their vehicles traveled the same route more than once a week, let alone two or three times, and therefore petitioners fail to qualify under their own definition of "regular routes".

In conjunction with their ADA argument, petitioners argue that one of the underlying purposes of section 6421 is to provide relief for local mass transportation systems, and therefore we must construe the statute to include paratransit providers as beneficiaries in order to be consistent with and further this purpose. See Greyhound Corp. v. United States, 495 F.2d 863, 868 (9th Cir. 1974) ("Special relief is also provided, in the case of gasoline, diesel fuel, and special motor-fuel taxes, for fuel used in the operation of local or mass transportation systems." (quoting H. Rept. 2022, 84th Cong., 2d Sess. (1956), 1956-2 C.B. 1285, 1289)). The legislative history of the statute as amended in 1978, the statute which we are construing in this case, states as the statute's purpose "to encourage greater use of bus transportation." S. Rept. 95-529, supra at 54, 1978-3 C.B. (Vol. 2) at 246 (emphasis added). Petitioner cites authority on statutory interpretation that notes that there is a presumption against an implied repeal of legislative purpose. However, we do not consider our holding to conflict with the purpose of the statute as originally enacted. Nor do we find that the 1978 amendment intended to repeal the stated purpose of the 1956 act. Rather, the 1978 amendment simply designated the scope of the local mass transportation systems that Congress wanted to qualify under section 6421. We cannot accommodate petitioners' request to ignore words in the statute and gloss over stated

congressional intent to achieve an overly broad interpretation that allows petitioners to qualify for the credit.

V.   Conclusion

Petitioners do not qualify under the section 34 credit for gasoline taxes because the transportation they provided did not meet the requirements enumerated in section 6421.  Petitioners' sedans did not qualify as buses, and petitioners did not provide any evidence for us to bifurcate the credit allowed toward their vans that may have possibly qualified.  Thus we decline to reach that issue of whether the vans qualify in light of the failure of proof.  Nor were petitioners' transportation services scheduled and along regular routes.  The routes petitioners traveled day-to-day were subject to change based on a myriad of factors.  None of the constructions of the statutes petitioners offered were persuasive.

To reflect the foregoing,

Decisions will be entered for respondent.